**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **TRANSCONTINENTAL** | : | **CIVIL NO. 1:13-CV-2163** |
| **REFRIGERATED LINES, INC., by** | : | |
| **LAWRENCE V. YOUNG, ESQ.,** | : | **(Chief Judge Conner)** |
| **liquidating agent,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **NEW PRIME, INC.,** *et al.*, | : | |
| | : | |
| **Defendants.** | : | |

**MEMORANDUM**

Presently before the court in the above-captioned adversary proceeding is

the motion (Doc. 61) filed by plaintiff debtor Transcontinental Refrigerated Lines,

Inc., ("Transcontinental"), by and through its liquidating agent, Lawrence Young,

Esq., ("Young"), to overrule the objections of Handler Thayer & Duggan ("HTD")

to production of certain documents based on attorney-client privilege.  For the

reasons that follow, the court will grant Transcontinental's motion.

**I.    Procedural History**[1]

The bankruptcy court confirmed the First Amended Plan of Reorganization

of Official Unsecured Creditors' Committee of Transcontinental ("First Amended

Plan") on November 16, 2009.  In re Transcontinental, No. 5:08-bk-50578, Doc. 354.

The First Amended Plan appointed Lawrence V. Young, Esquire, as liquidating

---

[1] The procedural background is derived from the docket sheets in the lead
case and adversary proceeding in the bankruptcy court.  In re Transcontinental,
No. 5:08-bk-50578 (lead); In re Transcontinental, No. 5:10-ap-00092 (adversary).

agent and vested him with control of all property and assets of Transcontinental's

estate.  See id.  The plan also conferred in Young the authority to assert and to

enforce "[a]ll causes of action under Chapter 5 of the Bankruptcy Code, all Claims

against third parties, and all other causes of action and rights belonging to or in

favor of [Transcontinental]."  Id.  On February 26, 2010, Transcontinental, through

Young, commenced this adversary proceeding in order to liquidate claims against

New Prime Inc.; Stephen P. Hrobuchak; Janis Hrobuchak; Nicole Hrobuchak;

Stephen Hrobuchak; David Hrobuchak; Lily Lake Family Trust; S&M Leasing,

Inc.; Cherry Marine, LLC; Kevin Davis; John Doe; Eric Kalnis; James Duggan;

Handler, Thayer & Duggan; and Handler Thayer LLP.  In re Transcontinental, No.

5:10-ap-0092, Doc. 1.  In response to the Rule 12 motion of several defendants,

Transcontinental filed an amended complaint on September  24, 2010.  Id. at Doc.

55.

On June 12, 2012, the bankruptcy court conducted a scheduling conference

with the parties.  Id. at Doc. 226.  During that conference, before discussion of any

scheduling matters, defendant New Prime Inc. ("New Prime") suggested that the

bankruptcy court might be divested of subject matter jurisdiction to hear certain of

Transcontinental's claims as a result of the United States Supreme Court's recent

decision in Stern v. Marshall, 131 S. Ct. 2594 (2011).  The bankruptcy court directed

New Prime to brief its subject matter jurisdiction concerns.  When New Prime

failed to file a motion or brief, the bankruptcy court issued an order directing all of

the parties to brief the issue within twenty-one days.  In re Transcontinental, No.

2

5:10-ap-0092, Doc. 237.  The parties submitted timely briefs, and the court held oral

argument on the limited issue of jurisdiction on October 11, 2012.

On June 10, 2013, the bankruptcy court issued an opinion and order

dismissing Transcontinental's non-core claims—Counts I, II, and X of its first

amended complaint—for lack of subject matter jurisdiction.  Id. at Docs. 243-44.

Transcontinental timely transferred those claims to the Court of Common Pleas

for Lackawanna County, Pennsylvania.  Hence, only its fraudulent transfer claims

pursuant to 11 U.S.C. § 548 remained pending in the adversary proceeding before

the bankruptcy court.  The court further held that, under Granfinanciera, S.A. v.

Nordberg, 492 U.S. 33 (1989), the § 548 claims were within its jurisdiction but could

not be tried unless the parties waived their right to a jury trial or consented to a

bankruptcy court jury trial.  In re Transcontinental, No. 5:10-ap-0092, Doc. 243 at 5,

7 (citing 28 U.S.C. § 157(d)).  The court conducted a telephonic conference call with

the parties, during which all defendants refused to waive their jury trial rights and

objected to a jury trial before the bankruptcy court.  (Doc. 1 at ¶ 15).

On August 13, 2013, Transcontinental moved to withdraw the reference of

the adversary proceeding from the bankruptcy court to this court.  Id. at Docs. 255-

56.  The bankruptcy court transmitted the motion to this court on August 15, 2013.

(Doc. 1).  On November 5, 2013, the court issued a memorandum and order (Docs.

9-10) granting the motion and withdrawing the reference of the above-captioned

adversary proceeding.  Pursuant to the court's directive, on November 11, 2013,

3

counsel filed all documents pertinent to the adversary proceeding to the docket in this matter.

The instant motion pertains to certain discovery requests Transcontinental served on HTD in July of 2010. (Doc. 61 ¶ 1). In September of 2010, HTD responded in part to the requests but raised objections to the production of billing records and other documents and information based upon attorney-client privilege. (Id. ¶ 2). In November of 2010, HTD served a privilege log on Transcontinental's counsel for the documents which it had either redacted or withheld. (Id. ¶ 3). In response to these objections, Transcontinental, through Young, moved to overrule the objections and compel production of certain documents identified in the privilege log. (Doc. 61). The motion is fully briefed (Docs. 61, 66) and ripe for disposition.[2]

## II.   <u>**Factual Background**</u>[3]

At all times material to this adversary proceeding, Stephen P. Hrobuchak ("Hrobuchak") was the president and sole shareholder of Transcontinental. (Doc. 43 ¶ 23; Doc. 61, Ex. E, Hrobuchak Dep. 56:19-22, Oct. 14, 2010 ("Hrobuchak Dep. B") (testifying that he "more or less ran the show" as the sole owner and chief executive officer of Transcontinental)). Transcontinental's fraudulent transfer

---

[2] HTD has since been dismissed from this action by settlement. (Doc. 100). Hrobuchak, as HTD's former client, continues to defend the privilege objections.

[3] This section is derived in part from Transcontinental's adversary complaint to the extent the allegations are admitted by Hrobuchak or HTD in their respective answers. It is otherwise derived from the record before the court.

claims arise out of prepetition activities and transactions between Hrobuchak and the various adversary defendants.

Transcontinental's claims have their roots in a December 3, 2007 transaction by which defendant New Prime, Inc. ("New Prime"), purchased substantially all of Transcontinental's assets through an asset purchase agreement that Hrobuchak, as president and sole shareholder, executed on behalf of Transcontinental.  (See Doc. 43 Ex. B).  Transcontinental argues that Hrobuchak structured that agreement, as well as certain contemporaneous and related transactions, in such a way that Transcontinental "received no consideration whatsoever for many of its assets, including its customer lists, vendor lists, trade secrets, pricing, and its substantial goodwill and other related intangibles."  (Doc. 43 ¶ 11).

The related transactions include an agreement to purchase real estate on which Transcontinental's facilities were located and a covenant not to compete. (See id. ¶¶ 16, 19).  The real estate consisted of three parcels: one conveyed by Hrobuchak individually; another by S&M Leasing, Inc. ("S&M"), an entity jointly owned by Hrobuchak and his wife; and the last by the Lily Lake Family Trust ("Lily Lake Trust"), a trust organized under the laws of Cook Island of which Hrobuchak's wife is the sole beneficiary and Hrobuchak is trustee.  (Id. ¶¶ 17, 35, 38-39, Ex. C). The covenant not to compete, executed at the same time as the asset and real estate agreements, obligated the Hrobuchaks and their limited liability company, Cherry Marine LLC ("Cherry Marine"), to refrain from competing with New Prime for five years in exchange for $1,000,000.  (Id. Ex. D).  Hrobuchak's signature appears on

each of the documents.  (Id. Exs. B-D).  Hrobuchak executed the asset purchase agreement on behalf of Transcontinental, the agreement to purchase real estate on behalf of himself, S&M Leasing, and the Lily Lake Trust, and the covenant not to compete on behalf of Cherry Marine.  (Id.)  Transcontinental alleges that by using these entities and deceptively structuring the various transactions, Hrobuchak shifted a substantial portion of the value of Transcontinental's assets to himself, S&M, the Lily Lake Trust, and Cherry Marine prior to an inevitable bankruptcy.

It is undisputed that Hrobuchak sought the advice of counsel for purposes of navigating the New Prime transactions.  Hrobuchak testified that he hired Handler, Thayer and Duggan ("HTD") to represent him in connection with the New Prime transactions after a joint referral from Roccy DeFrancesco, Esquire, and Rocco Beatrice, CPA.  (Doc. 66 Ex. B ¶¶ 5).  Attorneys Eric Kalnis ("Attorney Kalnis") and James Duggan ("Attorney Duggan"), two HTD partners, represented Hrobuchak.[4] HTD contends that it represented Hrobuchak, personally, and did not represent Transcontinental.  According to HTD, the attorney-client privilege belongs solely to Hrobuchak and cannot be waived by his former employer.  Transcontinental, on the other hand, responds that because Hrobuchak was its corporate officer, any of HTD's work affecting Transcontinental's interests was necessarily undertaken in a representative capacity.  Transcontinental also argues that because Hrobuchak retained HTD for purposes of accomplishing a fraudulent transfer, the crime-fraud

---

[4] Unless individually and separately identified, references to "HTD" include Attorneys Kalnis and Duggan.

exception to attorney-client privilege eliminates any protection his communications otherwise may have been afforded.  The court addresses these issues *seriatim*.

III.   **Attorney Client Privilege Generally**

The attorney-client privilege is intended to facilitate "full and frank communication between attorneys and their clients and thereby promote broader public interests in observance of the law and administration of justice."  Upjohn Co. v. United States, 449 U.S. 383, 389 (1981).  While recognizing the value served by the privilege, courts must also be mindful that the privilege obstructs the truth-finding process; as such, it should be applied "only when necessary to achieve its purpose."  Wachtel v. Health Net, Inc., 482 F.3d 225, 231 (3d Cir. 2007); see also Westinghouse Elec. Corp. v. Repub. of Philippines, 951 F.2d 1414, 1423 (3d Cir. 1991).  Accordingly, federal courts assess the application of the privilege on an individualized, case-by-case basis.  Wachtel, 482 F.3d at 230 ("Rule 501 of the Federal Rules of Evidence requires the federal courts, in determining the nature and scope of an evidentiary privilege, to engage in the sort of case-by-case analysis that is central to common-law adjudication.").

Evidentiary privileges in federal court are governed by the common law "as interpreted by United States courts in light of reason and experience." FED. R. EVID. 501.  The Third Circuit Court of Appeals has articulated the elements of attorney-client privilege as follows:

> The privilege applies only if (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of the bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (I) an opinion on law or (II) legal services or (III) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client.

Montgomery Co. v. Microvote Corp., 175 F.3d 296, 301 (3d Cir. 1999) (quoting

Rhone-Poulenc Rorer Inc. v. Home Indem. Co., 32 F.3d 851, 862 (3d Cir. 1994)).  The

party asserting the privilege bears the burden of proving its application.  See _In re_

Grand Jury Empaneled Feb. 14, 1978, 603 F.2d 469, 474 (3d Cir. 1979).

The attorney-client privilege applies to protect both individual and corporate

clients equally.  _In re_ Bevill, Bresler & Schulman Asset Mgmt. Corp., 805 F.2d 120,

124 (3d Cir. 1986).  However, because a corporation acts only through its agents, the

Supreme Court has held that any privilege that exists as to a corporate officer's role

and function within a corporation belongs to the corporation, not the officer.  Id. at

124-25 (quoting Commodity Futures Trading Comm'n v. Weintraub, 471 U.S. 343,

349 (1985) ("[T]he privilege in the case of corporations . . . presents special problems

[because] a corporation must act through agents.")).  This complex intersection of

corporate and personal privileges is material to the dispute _sub judice_.

IV.    **Discussion**

Transcontinental raises various objections to HTD's assertion of attorney-client privilege on Hrobuchak's behalf: *first*, that Hrobuchak waived his right to assert the privilege by testifying as to the identity of his attorney and the nature of HTD's representation of him; *second*, that many of the communications are "plainly non-privileged"; *third*, that HTD represented Transcontinental and not Hrobuchak, and thus only Transcontinental can assert or waive the privilege; and *fourth*, that the crime-fraud exception to attorney-client privilege vitiates any protections that may have otherwise attached to the communications.  (Doc. 61 at 14-26).  The court will first address Transcontinental's threshold challenges with respect to which party holds the privilege, as resolution of that issue is central to the remainder of Transcontinental's motion.

A.    **Who Holds The Privilege?**

In support of its argument that the privilege belongs to Transcontinental and not to Hrobuchak, Transcontinental cites to *In re* Bevill, 805 F.2d 120.  (See Doc. 61 ¶ 90).  Transcontinental argues that Bevill significantly limits an officer's ability to "assert personal claims of attorney-client privilege as to communications with corporate counsel" and asks the court to conduct *in camera* review of all documents withheld to determine whether any communication relates to HTD's representation of interests rightfully belonging to Transcontinental and not Hrobuchak.  (See id.).  HTD agrees with Transcontinental's summary of Bevill's principal holding but argues that it does not control here, when HTD represented only Hrobuchak in his

personal capacity.  (See Doc. 66 at 19-20).  The question of <u>Bevill</u>'s applicability thus turns on another key inquiry: whose interests did HTD represent in the asset purchase transaction?[5]

The parties are diametrically opposed in their suggested answers to this question.  Transcontinental asserts that HTD represented it alone, and that the privilege is Transcontinental's to assert or waive at its discretion.  (Doc. 61 ¶¶ 18-40, 88-96).  HTD responds that it represented Hrobuchak in his personal capacity and that the privilege protects every communication between HTD and Hrobuchak.  (Doc. 66 at 19-20).  After a review of the documents submitted for *in camera* review and the record thus far developed, the court disagrees with both parties.  Although HTD initially engaged itself solely as Hrobuchak's personal counsel, its substantial involvement in drafting and modifying the asset purchase agreement—which impacted only Transcontinental's interests—resulted in a limited representation of Transcontinental, by implication, as to the asset purchase agreement transaction.  Several key facts singularly support this conclusion, but for the benefit of the parties, the court will thoroughly explain its consideration of the *in camera* and record evidence.

---

[5] The bankruptcy court concluded, prior to ordering an *in camera* review of the documents, that HTD represented Transcontinental in connection with the asset purchase agreement.  See *In re* Transcontinental, No. 10-ap-0092, Doc. 208 at 7.  After reviewing each of the disputed documents *in camera*, this court agrees with the bankruptcy court's preliminary assessment, for the reasons discussed at length herein.

As a threshold matter, it is clear that at the outset, both HTD and Hrobuchak intended HTD's representation of Hrobuchak to be personal.  HTD's engagement letters are addressed to Hrobuchak, marked "personal and confidential," and make no mention of his relationship to, or the corporate interests of, Transcontinental. (Doc. 66 Ex. L).  HTD's billing statements are addressed directly to Hrobuchak and similarly marked "personal and confidential."[6]  (Id. Ex. D).  And Attorney Kalnis states in his affidavit that the relationship was between HTD and Hrobuchak, not HTD and Transcontinental.  (See id. Ex. C ¶¶ 7, 13 ("HTD did not perform any services for [Transcontinental], did not bill [Transcontinental] for any services, and did not receive any payments from [Transcontinental] or from the proceeds of the [Transcontinental] assets.")).  At first blush then, it seems that the attorney-client privilege should belong broadly to Hrobuchak, and to no other individual or entity, with respect to all communications between Hrobuchak and HTD.

Many of HTD's admissions, however, along with other documents of record and Hrobuchak's testimony, make clear that it represented not only the interests of

---

[6] HTD emphasizes that its communications and billings were directed to Hrobuchak, clearly demonstrating that the attorney-client relationship, and thus the privilege, belong solely to him.  Taken in isolation, this fact seems compelling. However, the record reveals that Hrobuchak was the sole shareholder of Transcontinental and the only person authorized to act on its behalf.  (Hrobuchak Dep. B 6:1-19 (testifying that he "more or less ran the show" as the sole owner and chief executive officer of Transcontinental)).  Given the fact that Hrobuchak alone controlled Transcontinental, it is unsurprising that confidential communications were addressed to, and decisions made by, Hrobuchak himself.  Consequently, the mere fact that a communication was addressed to Hrobuchak is largely irrelevant to the court's analysis.

Hrobuchak himself but also the interests of Transcontinental, at least with respect to the asset purchase agreement.  In its answer to Transcontinental's adversary complaint, HTD concedes it "provided legal services to [Hrobuchak] in connection with the [APA], [APRE], and Covenant Not to Compete" but maintains that it "did not represent [Transcontinental]." (Doc. 23 ¶ 126).  Its admitted role and intimate involvement in drafting Transcontinental's asset purchase agreement, a transaction impacting only Transcontinental's corporate interests, belie the latter averment.

During a 2008 deposition, Hrobuchak testified that in addition to S&M and the Lily Lake Family Trust, he retained HTD to represent himself "individually and Transcontinental."  (See Doc. 61, Ex. D, Hrobuchak Dep. 15:7-9, Nov. 17, 2008 ("Hrobuchak Dep. A")).  Hrobuchak testified that in retaining HTD, he was seeking one firm to "set up a new trust and to do the asset sale all in one, one firm to do it all." (Doc. 61, Ex. E, Hrobuchak Dep. 56:19-22, Oct. 14, 2010 ("Hrobuchak Dep. B")).  He also testified that Transcontinental paid HTD for the asset transaction aspect of the representation.[7]  (Id. at 201:6-11 ("[Transcontinental] paid them for – I'm sure

---

[7] HTD contends that Hrobuchak was "confused" with respect to most of the damaging testimony cited by Transcontinental.  HTD emphasizes that when asked subsequently by his counsel whether he retained HTD "to represent TCL, or . . . to represent you personally," Hrobuchak replied: "Me personally." (Hrobuchak Dep. B 6:20-7:1).  Hrobuchak also testified that he, and not Transcontinental, paid for the "work that [HTD] did," and that he misspoke during an earlier deposition when explaining who had paid HTD's legal fees.  (Id. at 13:2-6, 19:6-15 (stating that he "was giving sort of a theoretical answer there" based on a situation where HTD had actually done work for Transcontinental)).  HTD contends that Hrobuchak's amended testimony in subsequent depositions reverses all prior testimony and, more pertinently, serves to override all other evidence against its position.  HTD's conclusory argument is rejected, for all of the reasons discussed above.

for the – for the asset part of the job. . . .")).  HTD's records reflect that, initially, it was to be paid from the proceeds of the Transcontinental asset sale transaction for its work with respect to the same.[8]  (Doc. 61, Ex. H (undated document titled "Wire Instructions" instructing that HTD receive payment for certain legal services in the amount of $21,860.48 "[f]rom TRL, Inc. sale proceeds" and $24,573.65 from the real estate sale transaction)).

In addition to the logistics of representation, documents thus far produced reveal that the scope of services provided by HTD extended beyond representation of Hrobuchak personally.  HTD has produced copious email communications which squarely reflect that it played a significant role in drafting Transcontinental's asset sale agreement.  A November 21, 2007, email from Attorney Kalnis to Hrobuchak advises that "I have . . . attached *our requested modifications to your draft* of the asset purchase agreement."  (Doc. 61,  Ex. F at 1 (emphasis added)).  A November 26, 2007, email authored by Transcontinental's chief financial officer notes that its asset schedules had been forwarded, at Hrobuchak's request, to Attorney Kalnis.

---

[8] Transcontinental directs the court to a HUD-1 form dated December 3, 2007, reflecting $24,573.65 in attorney fees payable to HTD, the figure that HTD attributes to the real estate transaction.  (Doc. 61 Ex. I).  A revised HUD-1 form sent on the same day reflects an increase of $21,860.48 to the amount payable from the real estate proceeds.  (Id. Ex. J).  Transcontinental observes that $21.860.48 is the exact amount of attorneys' fees attributable to the asset purchase agreement and that HTD appears to have shifted the fees from the asset purchase agreement to the real estate transaction.  (See id. Ex. H (HTD Wire Transfer Instructions indicating that $21,860.48 is payable from "TRL, Inc. sale proceeds" to HTD)).  Consequently, the fact that Hrobuchak ultimately paid HTD in full from the real estate proceeds, (see Hrobuchak Dep. B 6:20-7:1), does little to refute HTD's own documents attributing legal fees for the asset purchase agreement to Transcontinental.

(Id. at 2).  On November 26, 2007, Attorney Kalnis emailed Hrobuchak another

"modified" draft of the asset purchase agreement.[9]  (Id. at 3).  On November 29,

2007, Attorney Kalnis obtained and forwarded to New Prime "copies of the signed

shareholder and director resolutions authorizing the sale as well as a draft bill of

sale."  (Id. at 6).  Attorney Kalnis inquired as to whether the scheduled assets were

free and clear of liens, whether Transcontinental had title to the automobiles being

sold, whether Transcontinental had copies of contracts and agreements including

customer contracts, broker-carrier agreements, supplier lists, and equipment

repurchase agreements, whether any legal causes of action existed concerning

assets, whether Transcontinental had inventory records for assets to be transferred,

and whether Transcontinental had any agreements with employees addressing its

obligations upon the sale of virtually all assets.  (Doc. 61, Ex. G).  HTD fails to draw

any connection, meaningful or otherwise, between these inquiries and Hrobuchak's

*personal* interests.  Indeed, these inquiries singularly pertain to Transcontinental's

---

[9] The descriptions of documents in HTD's privilege log further support the conclusion that HTD was closely involved in the asset purchase transaction on Transcontinental's behalf.  For example, HTD's privilege log identifies the subject matter of various documents as: (1) Email re Asset Purchase Agreement; (2) Email re asset sale and real estate sales; (3) Email re Asset Sale Agreement, with agreement attached; (4) Executed Asset Purchase Agreement with Attorney Kalnis's handwritten notes; (5) Draft Asset Purchase Agreement with Attorney Kalnis's handwritten notes; (6) Email re Asset Sale Agreement; (7) Draft schedules to Asset Purchase Agreement with Attorney Kalnis's handwritten notes; and (8) Draft Schedule A to Asset Sale Agreement with Attorney Kalnis's handwritten notes.  (HTD's Amended Privilege Log at 1-8).

corporate interests and make evident HTD's prominent role in drafting, modifying, and executing the asset sale transaction on Transcontinental's behalf.

Moreover, HTD's present position that it represented only Hrobuchak's personal interests with respect to the Transcontinental transaction is contradicted by Hrobuchak's testimony that he *had* no personal stake in the Transcontinental transaction.  (Hrobuchak Dep. B 23:15-19 (Hrobuchak testifying  "I really don't know" whether the asset purchase agreement "had any personal impact" on himself, his family, or his other investments)).  HTD contends that it did not represent or act on behalf of Transcontinental in connection with the asset sale, but the record evidence establishes that the *only* interests transferred in the sale were corporate, not personal.  (See id. at 24:2-15 (Hrobuchak explaining that the purpose of the asset purchase agreement was to sell assets owned by Transcontinental)).  Hrobuchak, personally, was not a party to the agreement—the writing states that it is "made and entered into . . . by . . . New Prime, Inc., a Nebraska corporation . . . , and Transcontinental Refrigerated Lines, Inc., a Pennsylvania corporation . . . ." (Doc. 66 Ex. B at 4).  Hrobuchak executed the agreement in his capacity as an officer, and on behalf of, Transcontinental.  (See, e.g., id. at 25).  Hrobuchak's admissions, the agreement itself, and documentary evidence of record directly refute HTD's position that it represented Hrobuchak's personal interests with respect to this transaction.

HTD lastly contends that Transcontinental employed Bill Abraham ("Abraham"), its general counsel, to handle its legal affairs, and that Abraham

15

represented Transcontinental in connection with the asset purchase transaction. (See Doc. 66 at 20 ("For its part, [Transcontinental] was not without counsel.")). Hrobuchak refuted this position, testifying that Abraham had no involvement in the asset purchase agreement.  (See Hrobuchak Dep. B 13:1-14:23).  He testified that Abraham was vice president of operations and did not "act as counsel at [Transcontinental]," (id. at 13:10-14), that he was "[n]ot whatsoever, not in the least" involved in the asset purchase agreement, (id. at 13:18-21), and that "he had no knowledge of it other than the fact that it happened, but . . . no involvement." (Id. at 13:23-25).  This argument is unavailing.

The totality of record evidence defeats HTD's *ipse dixit* position that it did not represent Transcontinental's corporate interests or act on its behalf.  When an attorney provides professional services both to a corporate officer, personally, and to a corporation, the corporation's privilege prevails to the extent the privileged communications derive from discussions of corporate matters.  See Bevill, 805 F.2d at 124-25 ("Because a corporation can act only through its agents, a corporation's privilege consists of communications by corporate officials about corporate matters and their actions in the corporation. A corporate official thus may not prevent a corporation from waiving its privilege arising from discussions with corporate counsel about corporate matters.").  As a result, neither Hrobuchak nor HTD may invoke the attorney-client privilege with respect to any communication that either impacted or implicated Transcontinental's corporate interests.  See id. at 124-25 ("[A]ny privilege that exists as to a corporate officer's role and functions within a

corporation belongs to the corporation, not to the officer.").  Hrobuchak may only assert the privilege to the extent that his communications with HTD involved purely personal interests.  <u>Id.</u> at 125 (observing that nothing precludes corporate officers from asserting "their personal privilege as to matters not related to their role as officers of the corporation").

The court's *in camera* review of the thirty-eight (38) documents subject to Transcontinental's motion reveals that few are privileged in their entirety.[10]  This is not an unexpected conclusion given the congruence of Hrobuchak's personal and business interests.  The following documents, identified by their HTD Bates Stamp, are unrelated to the asset purchase agreement and otherwise do not implicate Transcontinental's corporate interests.  The court finds that these documents are personally privileged to Hrobuchak, alone: HTD 1671-1677; HTD 1707-1709; HTD 1339-1340; HTD 1343-1345; HTD 1346-1347; HTD 1348-1349; HTD 1350-1352; HTD 1353-1356; HTD 1357-1359; and HTD 1780.  Barring an exception to the privilege, discussed *infra*, the court will deny Transcontinental's motion to compel with respect to these documents.[11]

---

[10] The court also concludes that one document, HTD 1372, is not privileged whatsoever.  The attorney-client privilege applies only to those communications which contain confidential client information.  <u>Wachtel</u>, 482 F.3d at 231 ("[B]ecause the purpose of the privilege is to promote the dissemination of sound legal advice, the privilege will extent only to advice which is legal in nature.").  HTD 1372 is a stock, out-of-office email response from Attorney Kalnis to Hrobuchak and does not contain confidential material.  Consequently, HTD 1372 is discoverable.

[11] Although the court agrees, in part, with HTD that the privilege belongs to Hrobuchak as to a handful of documents, nothing herein shall be construed as a

Each of the remaining documents, in whole or in part, implicates corporate interests belonging to Transcontinental.  The court's *in camera* review of these documents reveals that six (6) pertain solely to the asset purchase agreement and are privileged solely to Transcontinental:  HTD 1419-1482; HTD 1483-1535; HTD 1641-1670; HTD 1693-1706; HTD 1710-1711; and HTD 1573-1575.  These documents include draft copies of the asset purchase agreement with HTD's handwritten modifications and suggestions, and other communications between HTD and Hrobuchak indicating that HTD was making changes impacting Transcontinental at Hrobuchak's request.  These documents are privileged to Transcontinental alone.  The court will thus grant Transcontinental's motion with respect to these six documents and direct HTD to disclose the same forthwith.

The balance of the challenged documents contain a mix of communications and notes pertaining to *both* the Transcontinental asset purchase transaction *and* the contemporaneous transactions involving entities owned by Hrobuchak, for which he alone holds the attorney-client privilege.  These documents include: HTD 1373-1411, HTD 1536-1565; HTD 1566-1567; HTD 1712-1714; HTD 1715-1717; HTD 1718-1720; HTD 1721-1753; HTD 1341-1342; HTD 1360-1362; HTD 1363-1367; HTD 1417-1418; HTD 1773; HTD 1774-1775; HTD 1776-1777; HTD 1778; HTD 1779; HTD 1781-1782; HTD 1783-1784; HTD 1785-1786; HTD 1787; HTD 1788; and HTD 1789. The court's *in camera* review of these documents reveals that the bulk pertain

---

judicial endorsement of HTD's approach to dual representation of individual and corporate parties whose interests were so diametrically opposed.

primarily to the asset purchase transaction.  However, each contains at least one

reference to a transaction personal to Hrobuchak, involving either his intended

escrow account, the real estate transaction, or the covenant not to compete, thereby

implicating his personal privilege.  Similarly, the court's *in camera* review of HTD's

billing statements, spanning HTD Bates Stamps 0862-0912, reveals that the vast

majority are privileged to Transcontinental.  Several of the descriptions, however,

reference contemporaneous transactions for which Hrobuchak holds the privilege.

In the interest of judicial economy, the court first addresses Transcontinental's

arguments with respect to exceptions to the privilege before reaching a conclusion

as to these hybrid-privilege documents.

### B.     Challenges to Hrobuchak's Privileged Documents

Transcontinental raises several privilege challenges with respect to those

documents privileged to Hrobuchak in whole or in part.  Transcontinental argues

that Hrobuchak waived his personal privilege by testifying to the contents of the

various communications and by disclosing the contents to third parties, and that

the crime-fraud exception to attorney-client privilege requires all communications

to be produced.  (Doc. 61 ¶¶ 51-80 97-109).  Because the court ultimately agrees with

Transcontinental that the crime-fraud exception destroys Hrobuchak's personal attorney-client privilege, the court addresses only this argument.[12]

## 1.   The Crime-fraud Exception Generally

Transcontinental contends that any attorney-client privilege personal to Hrobuchak is vitiated entirely because Hrobuchak sought HTD's services in furtherance of committing a fraud.  (Doc. 61 ¶¶ 97-109).  Hence, the court must determine whether any privilege held by Hrobuchak is in fact destroyed by the crime-fraud exception.  A preliminary discussion of the crime-fraud exception and its intended purpose provides helpful guidance.

The protections offered by the attorney-client privilege are "not absolute." *In re* Grand Jury Subpoena, 745 F.3d 681, 687 (3d Cir. 2014) (observing that policies served by attorney-client protections cease to exist "where the desired advice refers not to prior wrongdoing, but to future wrongdoing" (quoting United States v. Zolin, 491 U.S. 554, 562-63 (1989))).  The crime-fraud exception to the attorney client privilege removes attorney-client protections when a client knowingly seeks the advice of counsel for purposes of a continuing or future crime.  See *In re* Grand

_____

[12] The court considers the applicability of the crime-fraud exception with respect to those documents privileged to Hrobuchak alone and those privileged to both Hrobuchak and Transcontinental.  As stated above, those documents are: HTD 1671-1677; HTD 1707-1709; HTD 1339-1340; HTD 1343-1345; HTD 1346-1347; HTD 1348-1349; HTD 1350-1352; HTD 1353-1356; HTD 1357-1359; and HTD 1780 (Hrobuchak alone); and HTD 1373-1411, HTD 1536-1565; HTD 1566-1567; HTD 1712-1714; HTD 1715-1717; HTD 1718-1720; HTD 1721-1753; HTD 1341-1342; HTD 1360-1362; HTD 1363-1367; HTD 1417-1418; HTD 1773; HTD 1774-1775; HTD 1776-1777; HTD 1778; HTD 1779; HTD 1781-1782; HTD 1783-1784; HTD 1785-1786; HTD 1787; HTD 1788; and HTD 1789 (Hrobuchak and Transcontinental).

Jury, 705 F.3d 133, 151-52 (3d Cir. 2012) ("The Supreme Court has explained that the crime-fraud exception is one limit on the scope of the protection afforded by the attorney-client privilege."); see also In re Grand Jury Subpoena, 745 F.3d 681, 687 (3d Cir. 2014); United States v. Doe, 429 F.3d 450, 454 (3d Cir. 2005).  In other words, the exception vitiates the attorney-client shield when "there is a reasonable basis to suspect that the privilege holder was committing or intending to commit a crime or fraud and that the attorney-client communications or attorney work product were used in furtherance of the alleged crime or fraud."  In re Grand Jury, 705 F.3d at 151-52.

To circumvent the privilege through this exception, the movant "must make a *prima facie* showing that (1) the client was committing or intending to commit a fraud or crime, and (2) the attorney-client communications were in furtherance of that alleged crime or fraud."  In re Grand Jury Subpoena, 223 F.3d 213, 217 (3d Cir. 2000).  The exception can and does arise in bankruptcy cases.  See, e.g., Levin v. DiLoreto, Adversary No. 99-0206, 2002 Bankr. LEXIS 2049, *42 (Bankr. E.D. Pa. May 23, 2002) ("[W]hen a client uses the prepetition services of an attorney to hide assets from creditors . . . , that attorney may testify about the hidden assets because the crime-fraud exception to the privilege applies")).

Courts have long endeavored to delineate the specific parameters of the crime-fraud exception and the burden that a movant must satisfy in order to gain its application.  See In re Grand Jury, 705 F.3d at 152 (collecting cases and analyzing varying standards across the circuit courts); see also EDNA SELAN

21

EPSTEIN, THE ATTORNEY-CLIENT PRIVILEGE AND THE WORK-PRODUCT DOCTRINE 679-706 (5th ed. 2007) ("Some courts talk in terms of a *prima facie* showing, others in terms of a *reasonable basis*, and still others in terms of *probable cause*." (emphasis in original)).  Although courts of appeals routinely articulate the same two-pronged test, it is the precise quantum of proof requisite to satisfy those elements which divides the various courts.  See *In re* Grand Jury, 705 F.3d at 151-52.  The Third Circuit recently acknowledged this division, observing:

> While there is general agreement on these precepts, courts of appeals are divided as to the appropriate quantum of proof necessary to make a *prima facie* showing.  This is not surprising.  "'Prima facie' is among the most rubbery of all legal phrases; it usually means little more than a showing of whatever is required to permit some inferential leap sufficient to reach a particular outcome."

Id. at 152.  The panel acknowledged the varying standards, id. at 152-153, and concluded that a "reasonable basis" standard encapsulates the Third Circuit's precedent.  Id. at 153.  The panel observed that a reasonable basis standard "affords sufficient predictability for attorneys and clients without providing undue protection to those that seek to abuse the privileges afforded to them," and is most consistent with the Supreme Court's holding that the crime-fraud exception will apply when there is "something to give color to the charge" that the communication was in furtherance of a fraud.  Id. (quoting Clark v. United States, 289 U.S. 1, 15 (1933)).

The Third Circuit articulated the appropriate crime-fraud analysis as follows:

> Where there is a reasonable basis to suspect that the
> privilege holder was committing or intending to commit a
> crime or fraud and that the attorney-client communications
> or attorney work product were used in furtherance of that
> crime or fraud, this is enough to break the privilege.  The
> reasonable basis standard "is intended to be reasonably
> demanding; neither speculation nor evidence that shows
> only a distant likelihood of corruption is enough."  At the
> same time, the party opposing the privilege is not required
> to introduce evidence sufficient to support a verdict of
> crime or fraud or even show that it is more likely than not
> that the crime or fraud occurred.

*In re* Grand Jury, 705 F.3d at 153-54.  Given the obvious difficulties in determining

whether a particular document contains material in furtherance of a crime or fraud

*in absentia*, district courts frequently review challenged documents *in camera* to

determine whether the exception applies.  See Zolin, 491 U.S. at 574-75 (permitting

practice of *in camera* review once *prima facie* case is established); *In re* Grand Jury

Subpoena, 745 F.3d at 687 ("Because it is often difficult or impossible to prove that

the exception applies without delving into the communications themselves, the

U.S. Supreme Court has held that courts may use *in camera* review to establish the

applicability of the exception.").  Measuring the *in camera* documents and record

evidence against these guideposts, the court is prepared to rule on the applicability

of the crime-fraud exception.

## 2.    *Application of the Crime-fraud Exception*

Transcontinental, in its adversary complaint, asserts various common law and statutory fraud claims against Hrobuchak arising from the prepetition transfers discussed *supra*.[13]  Transcontinental contends that Hrobuchak unlawfully shifted value from the asset purchase transaction to Hrobuchak's personal agreements in order to defraud Transcontinental's bankruptcy creditors.  (Doc. 61 ¶¶  97-106). Specifically, Transcontinental alleges that it was not compensated under the asset purchase agreement for its most valuable property, *i.e.* its customer lists, vendor lists, trade secrets, pricing information, goodwill, and other intangible assets.  (See Doc. 43 ¶¶ 100-102, 105).  It asserts that Hrobuchak "utilized HTD's legal services to defraud [Transcontinental] and its creditors by enriching himself at the corporation's expense"; that "Hrobuchak sought to–and did–act to benefit himself financially at the expense of [Transcontinental] and its creditors"; and that "HTD was aware of Hrobuchak's intentions and helped Hrobuchak enrich himself–and funnel funds to foreign bank accounts–at the expense of [Transcontinental] and its creditors."  (Doc. 61 ¶¶ 97, 103, 106).

Transcontinental directs the court to circumstantial evidence to support its *prima facie* claim of fraud.  Transcontinental submits two appraisals obtained in August of 2007 placing the value of Hrobuchak's various parcels of real estate at

---

[13] Transcontinental names several other defendants in each of the remaining fraud counts.  This memorandum addresses the fraud allegations only as they pertain to Hrobuchak.

$4.655 and $5.1 million, respectively.  (Doc. 61, Exs. K, L).  Despite both appraisals, New Prime ultimately paid Hrobuchak and his related entities $5.902 million for the real estate, $800,000 in excess of the properties' highest appraised value.  (See Doc. 43, Ex. C).  Transcontinental observes that the covenant not to compete between New Prime and Cherry Marine LLC, a Nevis-based limited liability company wholly owned by Hrobuchak, was valueless to New Prime because Nevis-based Cherry Marine had no means of competing with it, and thus New Prime received nothing of value in exchange for the $940,000 transferred to Hrobuchak pursuant to the covenant.[14]  (Doc. 43, Ex. D).  Transcontinental suggests that the $800,000 in excess value for the real estate sale and the $940,000 transfer to Cherry Marine represent improperly diverted compensation for Transcontinental's goodwill and other valuable intangible property, neither of which was contemplated in the asset purchase agreement.  (Doc. 43 ¶ 105).  As noted *supra*, Transcontinental also notes that various fees were shifted between the asset purchase agreement and the real estate transaction at the last minute and without explanation.  (Doc. 61 ¶¶ 35-36 (citing Doc. 61 Exs. H, I, J)).

---

[14] Transcontinental concedes that Hrobuchak also owned a Pennsylvania-based limited liability company likewise named "Cherry Marine, LLC," which did have assets sufficient to compete with Transcontinental.  (Doc. 61 ¶ 102).  It notes, however, that the Pennsylvania-based entity was not a party to and thus not bound by the terms of the non-compete agreement.  (Doc. 43, Ex. D).  Hence, New Prime received nothing of value in exchange for its transfer of $940,000 to Hrobuchak's Nevis-based company.  (Doc. 61 ¶ 102).

In response, HTD contends that Transcontinental's "theory" of fraud is factually flawed. (Doc. 66 at 22-24). It asserts, citing to Hrobuchak's October 2010 deposition, that New Prime was primarily interested in purchasing the real estate and thus incentivized to pay a price above the appraised fair market value. (Id. at 22-23 (citing Hrobuchak Dep. B 68:25-69:3 ("[New Prime] was only interested in the real estate."))). HTD also cites to Hrobuchak's testimony that prior to entering into the non-compete agreement, he "bought some trucks, started a company," which had the ability to compete with New Prime. (Id. at 23-24 (citing Hrobuchak Dep. B 55:16-56-5)). HTD offers no response to Transcontinental's apt observation that the covenant not to compete was binding only upon the Nevis-based LLC, not Cherry Marine LLC of Pennsylvania, and that the Nevis-based LLC was without the ability to compete with New Prime in any case.[15]

HTD contends that Transcontinental has not adduced a single communication which demonstrates that Hrobuchak possessed fraudulent intent or utilized HTD's services in furtherance of that intention. (See Doc. 66 at 24 ("In addition to all of the above shortcomings . . . [Transcontinental] also fails to identify any alleged communication between Hrobuchak and . . . HTD that furthered the alleged fraud.")). This contention serves only to underscore the essential need for *in camera* review, given that HTD withheld from production the very

---

[15] The court does not render formal credibility determinations at this juncture. Nonetheless, the court notes with interest that the only evidence HTD cites in opposition is the testimony of Hrobuchak himself—arguably the party most interested in protecting the communications in question.

communications which might support Transcontinental's position.  The court

concludes that Transcontinental's evidentiary presentation is sufficient to establish

a "reasonable basis" to suspect that Hrobuchak intended to use HTD's services in

order to enrich himself to Transcontinental's detriment and avoid inevitable

bankruptcy creditors.  See *In re* Grand Jury, 705 F.3d at 153-54 (rejecting

preponderance of the evidence standard and requiring only that movant establish

"a reasonable basis to suspect that the privilege holder was committing or

intending to commit a crime or fraud").  It is sufficient to trigger *in camera* review

of the challenged documents under the crime-fraud exception.[16]

The documents reviewed *in camera* confirm the initial inference established

by Transcontinental's circumstantial evidence and, if credited by a trier of fact,

---

[16] The bankruptcy court's decision directing the parties to produce the disputed documents for *in camera* review sought to address only the matter of which documents are privileged to whom.  (No. 10-ap-0092, Doc. 208 at 7)).  The decision did not address the propriety of *in camera* review pursuant to the crime-fraud exception.  For the record, the undersigned has concluded that an *in camera* review under the crime-fraud exception is also warranted.  See *In re* Grand Jury Subpoena, 745 F.3d at 688 (before conducting an *in camera* review of documents to determine whether the exception applies, "a district court 'should require a showing of a factual basis adequate to support a good faith belief by a reasonable person that *in camera* review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies'").

permit a finding that Hrobuchak intended to defraud Transcontinental's creditors.[17]

In particular, documents bearing Bates Stamps 1360-1367 and 1417-1418 reasonably

present a showing of fraudulent intent, compelling application of the crime-fraud

exception.[18]   A jury reviewing them could readily conclude that Hrobuchak sought

counsel and services from HTD in order to defraud Transcontinental's creditors.

Consequently, the crime-fraud exception applies to vitiate protections otherwise

applicable to these communications.   See Doe, 429 F.3d at 454 ("Only when a client

knowingly seeks legal counsel to further a continuing or future crime does the

crime-fraud exception apply.").

### 3.        *Extent of the Exception's Application*

That the exception applies does not end the court's inquiry.   The court must

next consider whether the fraudulent intent demonstrated by these two

communications compels disclosure of all communications pertaining to the

_____

[17] The court caveats these observations by noting that it makes no findings as to the merits of Transcontinental's claims.  However, Transcontinental has raised sufficient inferences which, coupled with revelations in the documents reviewed *in camera*, would permit a reasonable trier of fact to find that Hrobuchak did commit a fraud.  Accordingly, Transcontinental has made a sufficient factual showing to invoke the crime-fraud exception to the attorney-client privilege.

[18] In light of the particular sensitivity of many of the disputed documents and in order to avoid premature disclosure in the event Hrobuchak exercises his rights to challenge this decision, the court is circumspect in its description of the various documents supporting its decision.  The Third Circuit has expressly endorsed this cautious approach.  See Haines, 975 F.2d 81, 97 (3d Cir. 1992) ("Because of the sensitivity surrounding the attorney-client privilege, care must be taken that, following any determination that an exception applies, the matters covered by the exception be kept under seal or appropriate court-imposed privacy procedures until all avenues of appeal are exhausted.").

transactions at issue.  In other words, the court must consider the extent to which

Hrobuchak's privilege is lost, and whether any of the disputed documents remain

protected.

The crime-fraud exception applies to all communications that were intended

" to facilitate future wrongdoing by the client."  Haines, 975 F.2d at 90.  Thus, while

abuse of the privilege may not vitiate its protections entirely, cf. In re Berkley & Co.,

629 F.2d 548, 555 (8th Cir. 1980), the privilege is destroyed to the extent there is any

nexus between the attorney-client communications and facilitation, furtherance, or

fulfillment of the client's crime or fraud.  See In re Grand Jury Investigation, 445

F.3d 266, 277 (3d Cir. 2006) (rejecting a relaxed "related to" standard and requiring

that attorney-client communications be "in furtherance of" a crime or fraud).  A

communication is made in furtherance of crime or fraud, and thus falls within the

crime-fraud exception, if it advances, or the client intends it to advance, the client's

criminal or fraudulent purpose.  In re Grand Jury Subpoena, 745 F.3d at 692-93.

The court's review of the documents privileged in part or full to Hrobuchak

reveals that each communication furthered the asset purchase agreement, the

agreement to purchase real estate, the covenant not to compete, or supplemental

but ancillary transactions.  Indeed, each communication reflects a necessary step

toward the accomplishment of Hrobuchak's ultimate goal.  In other words, each

disputed document shares a direct nexus to Hrobuchak's ostensible end game.

Again, in the interest of caution, the court will describe this nexus in only general

terms: HTD 1671-1677 (draft escrow agreement with notes reflecting

29

communications with Hrobuchak); HTD 1707-1709 (draft covenant not to compete with similar handwritten notes); HTD 1339-1340 (email from Hrobuchak to HTD regarding real estate agreement); HTD 1343-1359 (correspondence between Hrobuchak's agents and HTD regarding Hrobuchak's intentions in engaging HTD); HTD 1779-1780 (to-do lists and questions regarding asset purchase and real estate transactions); HTD 1373-1411 (draft asset purchase agreement); HTD 1536-1565 (draft asset purchase agreement with notes reflecting communications with Hrobuchak); HTD 1566-1567 (email to Hrobuchak indicating HTD made changes at his direction); HTD 1712-1720 (Transcontinental and New Prime letter of intent with attorneys' notes); HTD 1721-1753 (draft asset purchase agreement with notes reflecting communications with Hrobuchak); HTD 1342-1342 (email to Hrobuchak indicating that HTD made certain changes at his request); HTD 1360-1367 and HTD 1417-1418 (communications directly noting Hrobuchak's intent); HTD 1773-1778 (handwritten notes, charts, and lists reflecting communications with Hrobuchak and intention for transactions); HTD 1781-1788 (notes reflecting communications with Hrobuchak).

Because each communication, or document reflecting a communication, pertains to the furtherance of an allegedly fraudulent transfer, each is subject to the crime-fraud exception.  The court concludes that the exception applies to destroy Hrobuchak's attorney-client privilege with respect to all documents privileged to him in whole or in part, and compel full disclosure of all documents requested by Transcontinental.

V.     **Conclusion**

Based on the foregoing, Transcontinental's motion (Doc. 61) to overrule

HTD's  objections to production of documents based on attorney-client privilege

and to compel production of those documents will be granted in its entirety.  An

appropriate order follows.


                                      /S/ CHRISTOPHER C. CONNER
                                      Christopher C. Conner, Chief Judge
                                      United States District Court
                                      Middle District of Pennsylvania


Dated:        June 3, 2014